**Opinion filed March 31, 2017**



# In The

# Eleventh Court of Appeals

_____

## No. 11-15-00036-CR

_____

## EDDIE RAY ROUTH, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 266th District Court**

**Erath County, Texas**

**Trial Court Cause No. CR14024**

## O P I N I O N

The jury rejected Eddie Ray Routh's insanity defense and convicted him of capital murder for the murders of Christopher Scott Kyle and Chad Hutson Littlefield. *See* TEX. PENAL CODE ANN. § 19.03(a)(7) (West Supp. 2016). The State did not seek the death penalty. Therefore, the trial court assessed Appellant's punishment at confinement for life without parole and sentenced him accordingly.

*See id.* §12.31(a)(2); TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1 (West Supp. 2016). We affirm.

Appellant challenges his conviction in three points of error. In his first point of error, he asserts that the jury's verdict was improper because Appellant did not know that his conduct was wrong. Appellant maintains in his second point of error that the trial court erred when it denied Appellant's motion to suppress statements that he made to Texas Ranger Danny Briley. Finally, in his third issue, Appellant contends that the trial court abused its discretion when it overruled his motion for a mistrial.

We take Appellant's first point of error to be a challenge to the sufficiency of the evidence to support the jury's rejection of Appellant's affirmative defense of insanity. Section 8.01 of the Texas Penal Code provides: "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." PENAL § 8.01(a) (West 2011). The Court of Criminal Appeals has defined "wrong" in this context to mean "illegal." *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). "[T]he question for deciding insanity is this: Does the defendant factually know that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified?" *Id.* Appellant bore the burden to prove his affirmative defense of insanity by a preponderance of the evidence. *Id.* at 591 n.13, 592.

In a challenge to the legal sufficiency of the evidence to support a rejection of an affirmative defense, we use the standards for review expressed by the Supreme Court of Texas in *City of Keller v. Wilson*. *Matlock v. State*, 392 S.W.3d 662, 668–69 (Tex. Crim. App. 2013) (citing *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005)). We first look to whether there is more than a scintilla of evidence to support the jury's rejection of Appellant's affirmative defense. *Id.* at 669. We review the

evidence in the light most favorable to the verdict, and we credit any favorable evidence if a reasonable factfinder could and disregard any contrary evidence unless a reasonable factfinder could not. *Id.* If we find no evidence to support the jury's rejection of Appellant's affirmative defense, we look to whether Appellant established, as a matter of law, the elements of his affirmative defense. *Id.* at 669–70. Evidence that is subject to a credibility assessment is not considered because it is within the jury's province to disregard that evidence. *Id.* at 670. "Only if the appealing party establishes that the evidence conclusively proves his affirmative defense and 'that no reasonable jury was free to think otherwise,' may the reviewing court conclude that the evidence is legally insufficient to support the jury's rejection of the defendant's affirmative defense." *Id.* (footnote omitted) (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009)).

To determine whether the evidence was factually sufficient to support the jury's rejection of Appellant's affirmative defense, we look to whether the jury's adverse finding was so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* at 671 (citing *Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990)). We view all the evidence in a neutral light, but we may not substitute our judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Id.* If we find that the evidence that supports the affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, we will reverse the trial court's judgment and remand the case for a new trial. *Id.* at 672.

Appellant is a former Marine, with service in Iraq and other places. After Appellant's service ended, the Veterans Administration diagnosed Appellant with post-traumatic stress disorder. Sometime in early January 2013, Appellant's mother, Jodi Routh, asked Kyle, a former Navy Seal, to help Appellant. Jodi knew Kyle. Kyle's children attended the elementary school where Jodi worked. She had seen

Kyle there from time to time and had heard a speech that he had given at the school. She knew that he helped veterans and that he had written a book. She told Kyle that the VA had diagnosed Appellant with PTSD. Kyle told her that he also suffered from PTSD and that he would do anything and everything in his power to help Appellant, even though Kyle did not know Appellant at the time.

Later, on February 2, Kyle went to Appellant's home in Lancaster; Littlefield went with him. After they picked up Appellant, they drove to Rough Creek Lodge near Glen Rose; they arrived at Rough Creek Lodge around 3:15 that afternoon. When they arrived, Kyle stopped at the main lodge and went inside to see if they could use the shooting range. Once they were cleared to use the shooting range, they left the main lodge and drove to the range. By 5:00 that afternoon, Kyle and Littlefield lay dead on the shooting range.

Both suffered from multiple gunshot wounds. Kyle was shot six times, and Littlefield was shot six or seven times, depending on whether one bullet re-entered Littlefield's body after its initial exit. Several bullets were recovered during the autopsies. The State's firearms expert was able to match the bullets recovered from Kyle to the Springfield XD-45 .45 auto caliber pistol that was found at the scene and was able to match the bullets recovered from Littlefield to the Sig Sauer semi-automatic P226 nine-millimeter Luger caliber pistol that was found in Kyle's pickup after officers arrested Appellant. Also found at the scene were eight shell casings that matched the Springfield XD-45 pistol and three shell casings that matched the Sig Sauer P226 pistol.

Howard J. Ryan, a forensic operations specialist in New Jersey, testified as an expert in the fields of shooting incident reconstruction and bloodstain pattern analysis. He performed a reconstruction of the incident and determined that Kyle did not see the gunfire coming. Kyle's gunshot wounds were located in one general area—the upper portion of the right side of his body. The pattern indicated that Kyle

4

did not move after he was shot; the shots were incapacitating. The pattern also indicated that the shooter would have been fairly close to Kyle when he fired the shots.

Ryan further determined that the first two shots that Littlefield sustained were shots to his back, one of which hit his spinal column. He opined that those were also not long distance shots and that they were also incapacitating. Ryan believed that Littlefield went down to one or both knees after sustaining the two shots to the back and that, while he was on his knees, sustained a shot to the back of his head. Littlefield then fell backward and ultimately landed on his back. The evidence showed that Littlefield sustained a shot to the top of his head and to his face either while he was on his knees or was already on his back on the ground. Ryan testified that the most likely scenario, due in part to a lack of blood spatter evidence, was that Littlefield was lying flat on his back when he sustained the shots to the top of his head and to his face.

Ryan believed that the shooter would have been standing in between Kyle and Littlefield, slightly behind them. Ryan also believed that the shooter chose to wait until Kyle's revolver was empty before he began shooting at Kyle and Littlefield. The evidence further showed that Appellant fled the scene in Kyle's pickup, made several stops before returning to his home, and was ultimately apprehended by officers with the Lancaster Police Department.

Appellant's uncle, James Watson, testified that he talked to Appellant on the day of the incident. Watson spent time with Appellant at Appellant's home on the morning of the incident. Watson saw Appellant again that afternoon when Appellant went to Watson's house in Alvarado. They visited for a few minutes at Watson's house, and Appellant showed him a nine-millimeter semi-automatic handgun. Appellant was driving a black Ford pickup that Watson had not seen him drive before. He told Watson that he was driving a "dead man's truck." Watson thought

5

that Appellant was talking about himself, not an actual dead person, because Appellant often made "bizarre comments like that about himself"; Appellant thought that the government was after him. Appellant did not stay at Watson's for very long.

Laura Blevins, Appellant's sister, testified that Appellant called her cell phone on the evening of the offense. She did not want to answer because she had "just about had [her] limit" with his outbursts. He would talk about things that were not relevant to their conversation and that were "out of the blue." She knew that a knife had been involved during his last outburst with his girlfriend, and that fact "pushed [her] limits" for his being around her child. Nevertheless, she answered the phone and had a brief conversation with Appellant. Laura then gave the phone to her husband, Gaines Blevins, so that he could talk to Appellant. When she found out that Appellant was coming to their house, she was angry. She told Gaines that, if Appellant started talking nonsense, she was going to call the police and have him committed. She knew that "he wasn't quite right"; she wanted him to have treatment.

When Appellant showed up at her house, Laura knew that he was not himself. He was talking about "pigs sucking his soul" or, as she wrote in her statement to police, "people were sucking his soul and he could smell the pigs." He told the Blevinses that he had killed two guys. At first, Laura did not believe him because he was not talking normally, but she started to get concerned when he continued talking about it and when she saw the pickup that he was driving. He told her that he took their souls before they could take his and explained that they were out to get him. He also told her that he sold his soul for a pickup. Laura told him that he needed to turn himself in if he really killed someone. Appellant told her that he was going to Oklahoma, and he left shortly thereafter.

Terrified, Laura called 9-1-1 and reported that Appellant had just left her house and that he had said that he killed two men at a shooting range and took one

of their pickups. Laura also told the dispatcher that she did not know whether Appellant was on drugs but that he was crazy and psychotic. Gaines told the dispatcher that Appellant had recently been diagnosed with post-traumatic stress disorder. Laura testified that she was not trying to help Appellant out by saying that he was psychotic; she was just genuinely afraid for her family and herself.

Gaines testified that Appellant came to their house on the evening of the offense and that Appellant seemed confused and "to not be there completely"; he was not his normal self. However, Appellant did not smell like alcohol or marihuana and did not appear to be drunk. The first thing that Appellant said to Gaines was, "[I]s it just me or is the world freezing over." He then went on to say that "he took two souls before they could take his." Appellant said he shot "Chris Kyle and his friend." He explained that he was at target practice with them and that he could not trust them anymore. He also said that he traded his soul for the pickup that he was driving. Appellant told them that he was going to try to get to Oklahoma before Texas could get him. After Appellant left, the Blevinses called 9-1-1 and then drove to the Midlothian Police Department.

Lieutenant Michael Smith of the Criminal Investigations Division of the Lancaster Police Department, who was assistant chief of the department at the time of the incident, testified that, on the date of the offense, he was called to Appellant's home by Detective Jesse Chevera to "check on things." Detective Chevera lived next door to Appellant and, based on some information that he had learned, was concerned about his house and his family.

Appellant was not at his house when Lieutenant Smith and Detective Chevera arrived. However, Appellant arrived while the officers were discussing the information that they had received. Appellant was driving Kyle's pickup. Appellant opened the door, but he never got out of the pickup. Detective Chevera tried to get Appellant to talk to him and to get out of the pickup, but Appellant refused.

7

Appellant shut the door, cracked the window, and turned off the pickup. Appellant either told them that he had "taken a couple of souls and he had some more souls to take" or that "he had taken two souls that he had to take before they took his." He made several other comments, such as: "It's just happening so fast, I don't know if I'm, um, going insane"; "The f---ing anarchy has been killing the world"; and "I can feel everybody feeding on my soul." Lieutenant Smith testified that he did not know whether Appellant was intoxicated, high, an odd guy, or "straight up nuts"; he was just trying to get Appellant out of the pickup.

While Lieutenant Smith and Detective Chevera talked to Appellant, two other officers put "stop sticks" on the back tires of Kyle's pickup in order to try to disable the pickup. Appellant continued to refuse to get out of Kyle's pickup.

After approximately twenty to thirty minutes, Appellant fled in the pickup, and multiple Lancaster police officers pursued him. During the pursuit, an officer rammed the pickup with his marked squad car, and the pickup eventually became disabled and was no longer operable. Appellant got out of the pickup with his hands up in the air and immediately got down on the ground. Officers detained Appellant at approximately 8:30 p.m.

When asked why he ran from them, Appellant responded, "I have been having panic attacks all day." The State presented a video that depicted Appellant sitting in the back of a patrol car. Appellant stated that he had a disease and had been in Iraq. Appellant appeared very distraught. Officer Flavio Salazar, of the Lancaster Police Department, tried to get Appellant to calm down and relax so that the EMTs could check him out. Appellant said that he did not know what was happening in his world. Appellant was much calmer when no one was around and the patrol car doors were closed, but he was crying.

Appellant asked Detective Chevera if he was going to go to the insane asylum; Detective Chevera did not respond. While in the patrol car, he also stated that he

8

was nervous about what had been happening in his life that day, that he did not know what had been happening, that he had been so paranoid schizophrenic all day that he did not know what to think of the world, that he did not know whether he was insane or sane, and that he did not know what was sane in the world. Officer Salazar transported Appellant to the Lancaster Police Department, and when they arrived, Appellant said, "This is like the most comfort I've had in a couple days being in this cop car. I'm serious."

Later, Ranger Briley conducted a custodial interrogation of Appellant at the Lancaster Police Department. Ranger Briley testified that he informed Appellant of his constitutional rights, including the right to remain silent; Appellant agreed to speak with him. He explained that Appellant responded to questions in an unusual, bizarre, or philosophical manner. There were times when Appellant's responses had no logical connection to what Ranger Briley was asking: "[s]ome of the stuff I had no clue what he's talking about."

Appellant told Ranger Briley that he kept "talking to Chrises in my world" and that he would talk to one Chris and get sent to another man named Chris. He said that he thought about talking to the wolf, "the one in the sky." "The ones in the sky are the ones that fly . . . the pigs." He said that he could tell the difference between "pig s--t" and "bulls--t" and two different kinds of "pig s--t." He also told Ranger Briley that there were no straight streets in Texas and that there were no square towns. Appellant said that you "can't just keep letting people eat your soul up for free." He said that tons of people were eating at his soul and that he could not sleep. He also commented that "the Reds are already eating up all the Indians" and that "the warlords aren't very happy with me." He said that "the sandman keeps winning." Appellant further commented that "you can eat souls when you are down here," "but you can never make any more after . . . the true souls are gone." Several times throughout the interview Appellant asked if Ranger Briley could take off

9

Appellant's handcuffs. At one point, Appellant said that he needed to get the cuffs off before they started strangling his neck.

As to the offense itself, Appellant told Ranger Briley that Kyle and Littlefield came and got him from his house and they drove down to the country and did some shooting sports. He explained to Ranger Briley that Kyle and Littlefield were head hunters and were trying to hunt people down. He admitted that he killed Kyle and Littlefield with a nine-millimeter pistol. He said that he fired "a couple, few" shots and that he was "right up close to them." They just lay there after he killed them; they were not breathing anymore. It happened around two or three o'clock. With regard to Kyle, he explained that he knew that, if he did not take Kyle's soul, Kyle was going to take his soul next or have one of Kyle's gangsters take it.

Appellant told Ranger Briley that he fled after he shot Kyle and Littlefield. He drove to his sister's house and asked her if she wanted to see the guns in the pickup. He reported to Ranger Briley that he told his sister that he had to kill a man and that it was not a "want to," it was a "need"; otherwise, he "would be the next one out there getting [his] head shot completely off." Appellant told Ranger Briley that he understood the difference between right and wrong and that he knew what he did was wrong. He said that he knew killing them was wrong. Appellant asked Ranger Briley whether his parents had made it yet. He wanted to give his mom a hug one last time.

Appellant told Ranger Briley that he was sorry for what he had done and that he wanted to get help. He wanted to tell the family that he was so sorry for what he had done and that, if he could have done it differently, he would have done it so much differently.

In addition to Ranger Briley's testimony that Appellant had admitted to him that he killed Kyle and Littlefield, Gene Cole, a deputy at the Erath County Sheriff's Office in 2013, testified that, while he was on duty at the Erath County Jail, he heard

10

Appellant say, "I shot them because they wouldn't talk to me." He further heard Appellant say, "I was just riding in the back seat of the truck and nobody would talk to me, they were just taking me to the range, so I shot them, I feel bad about it, but they wouldn't talk to me, I'm sure they've forgiven me."

Based on Appellant's responses to Ranger Briley's questions about whether Appellant knew what he did was wrong, Ranger Briley believed that "clearly [Appellant] knew what he was doing was wrong." He explained that Appellant was able to recall specific details about the trip to the gun range, one of the murder weapons, and the crime itself. Ranger Briley also believed that Appellant knew what he did was wrong because Appellant used the word "fled" when he told Ranger Briley what he did after he left the scene.

Ranger Briley asked Appellant whether he had used drugs at all that day, and Appellant told him that he had used marihuana. Ranger Briley asked him if there was anything else, besides marihuana, and Appellant said, "[Y]ou can't trust anything in Texas . . . because it's usually laced up, you know, laced up so f---king tight with different drugs." In response to Ranger Briley's question of what the marihuana would have been laced with if it was laced, Appellant responded that the marihuana could have been "wet" with "Purple Hearts" or laced with anything, including formaldehyde.

Officer Salazar and Texas Ranger Ronald Eugene Pettigrew described "wet" marihuana as marihuana that had been dipped in Phencyclidine (PCP) or formaldehyde. They explained that "Purple Hearts" was a slang term for a form of marihuana that had higher THC levels or was more potent than other strains; the strain was also called "Purple Kush." Ranger Pettigrew agreed on cross-examination that, in order to know whether marihuana was "wet," it had to be tested by a chemist. However, the State's chemist explained that the presence of formaldehyde could not

11

be tested because formaldehyde was a very volatile chemical that evaporated very quickly and would most likely evaporate by the time it was received for testing.

Texas Ranger David Armstrong and other Texas Rangers searched Appellant's house and found several items of drug paraphernalia. Specifically, they found two pipes, two packages of rolling papers, a rolling mechanism, a grinder, a bong, a ceramic smoking device that looked like a cigarette, and a leafy substance that was later identified as marihuana. The marihuana and drug paraphernalia did not test positive for any foreign substances such as formaldehyde. Ranger Armstrong testified that he smelled marihuana in the house but admitted that he did not put that in his report. He did not touch the pipes or the bong to see if they were warm.

Ranger Armstrong also testified that there was a whiskey bottle that was "not even a quarter of the way full" on the kitchen table but that he had no idea when someone last drank out of it. He also found a prescription bottle of risperidone, an antipsychotic medication that was prescribed to Appellant, on top of the refrigerator.

Appellant was not subjected to a blood draw, nor did the investigating officers pursue a warrant to seize Appellant's blood. Ranger Armstrong testified that he did not get close enough to Appellant to smell alcohol or marihuana on Appellant and that he did not remember any of the other officers that were at the scene of Appellant's arrest telling him that they smelled alcohol or marihuana on Appellant. Ranger Briley testified that he did not smell alcohol on Appellant during his interview of Appellant. However, Sergeant Kenny Phillips, who was working at the Erath County Jail in February 2013, testified that he believed that Appellant was under the influence when he transported Appellant from the Lancaster Police Department to the Erath County Jail.

Texas Ranger Michael Adcock testified that he found a receipt from Taco Bell in the driver's side door of Kyle's pickup. The receipt showed a purchase of two

12

bean burritos from the Taco Bell in Red Oak at 6:50 p.m. on the night of the incident. Texas Ranger Pettigrew found a cell phone in the center console of Kyle's pickup. He took that cell phone, which was later determined to belong to Littlefield, and Kyle's cell phone found at the scene of the crime to the Secret Service for analysis.

Jeff Shaffer, who was employed by the Secret Service during the time of the investigation and specialized in digital forensics, testified that he received three phones to analyze: one belonged to Kyle, one to Littlefield, and one to Watson. Shaffer retrieved several text messages between Kyle's and Littlefield's phones regarding Appellant. The first message was sent from Kyle to Littlefield at 2:30 p.m. on the day of the offense and read: "[T]his dude is straight up nuts." At 2:32 p.m., Littlefield responded to Kyle: "[S]itting behind me, watch my 6," meaning "watch behind me" or "[w]atch my back." Kyle answered, "Got it," at 2:35 p.m.

While he was in jail in Erath County, Appellant made two phone calls to Nicholas Schmidle, a reporter for the New Yorker magazine. The jury heard tape recordings of these conversations.

Appellant made the first phone call to Schmidle less than two weeks after Appellant was transported to the Erath County Jail. Appellant told Schmidle that he needed to do ten years' worth of writing to get everything squared away and that he needed to get his bail money up so he could get to New York or Washington D.C. to tell a staff writer his story. He explained that he had been set up for failure his whole life and that everyone knew it but would not say anything about it. They did not want to take responsibility for it like he had.

On May 31, 2013, Appellant again called Schmidle and told him that he felt like he had to kill Kyle and Littlefield before they killed him. He said that the air "smelled like s--t" that morning. He also told the reporter that it smelled like sweet cologne and then it turned sour; it smelled like love and hate. They were not talking to him on the ride over. When they got to the range, Littlefield was not shooting; he

13

was just watching. Appellant said that he shot Littlefield first and Kyle second. Kyle was just "finishing a magazine" when Appellant started shooting. Appellant further told the reporter that it tore his "f---ing" heart out when he did it; he did not know why he did it, but he did it. He said that he felt "sh--ty" about it and that he guessed "you live and you learn."

The jury not only heard testimony about the events surrounding the shooting, as we have set out in detail, but also heard testimony from several witnesses about Appellant's behavior and demeanor during the time leading up to the offense.

Appellant's mother, Jodi, testified that Appellant did not have a history of mental illness, nor was he treated for any mental illness prior to joining the military. She explained that he was different when he left the military. He was not his "happy-go-lucky" self like he had been; he was a lot more serious and was very concerned for his family. He was more aware of who was around him, and he acted paranoid. He sometimes was unable to express how he was feeling. After he served with the Marines, "the least little thing would set him off." He angered more easily and had angry outbursts.

After he completed his regular service with the Marines, Appellant was hospitalized on several occasions at Green Oaks Hospital and at the Veterans Administration Hospital in Dallas. He was once hospitalized for threatening to kill himself and his family. At one point, he was on nine different medications, including antipsychotic medications, sleeping pills, and mood elevators. Appellant was last hospitalized at the VA Hospital from January 20 through January 25, 2013. Jodi pleaded with hospital personnel not to release him.

Jodi also testified that she knew that Appellant had smoked marihuana in the past. She admitted that she had even smoked marihuana with him. However, she did not believe that he was abusing marihuana, and she explained that it made him much calmer. Laura, Appellant's sister, also knew that Appellant smoked

14

marihuana. When she was around him when he smoked marihuana, he was funny and more relaxed.

Donna Taylor was a longtime friend of the family. She testified that, in high school, Appellant was sweet, kind, and ready to help. When he came back from the Marines and started working for her at her cabinet shop, he seemed distant, disturbed, and bothered—not "fun-loving." Taylor testified that Appellant did "fine" most of the time at the shop but that he would occasionally be in a "catatonic state, just staring straight ahead, like a blank look on his face." Somewhere around January 20, 2013, Jodi asked Taylor to keep some guns that belonged to the Routh family. She asked Taylor to keep them because she was concerned about the safety of their family in light of Appellant's prior threat to kill his family and himself. Taylor further testified that she drove Appellant home from work on the Friday before the offense. He seemed "a little depressed" or "down" but not confused. He was not saying anything "bizarre."

Jennifer Weed (Jen), who has a degree in psychology, was Appellant's girlfriend at the time of the incident. She provided details of several specific incidents that occurred in January and February 2013. The first incident that she described occurred in early to mid-January. Appellant's uncle called her and was concerned about Appellant. She drove to Appellant's home, and he was visibly upset. He was not speaking; he sat on the couch in the living room and stared at the wall for hours. At times, he would burst into tears, and at other times, he would burst into laughter. She testified that it was very erratic behavior and that she stayed with him for a few days until he seemed to be more himself.

On January 18, Appellant became upset with her and started calling her names, accusing her of using drugs, and accusing her of trying to "steal his soul." He called her a crack whore and a demon. They were at her apartment, and he kept insisting that she take him back to his house because he was going to die that night

and he wanted to say goodbye to his mother. She was eventually able to calm him down. The next morning, Appellant asked her to take him to his attorney's office. After she finished getting ready, she asked Appellant if he was ready. He was sitting on the couch and was visibly shaking and sweating through his shirt. He refused water and would not tell her what was going on. When they started walking toward the front door, Appellant grabbed a decorative Ninja sword that was by the door and told her that they were not going anywhere because people were out to get them.

Jen sent a text message to her roommate and told her to stay in her room for as long as possible. Appellant put down the Ninja sword at some point and got a knife from the kitchen; he was holding the knife by his side. Jen's roommate eventually came out of her room because she had to go to work; she was able to text a police officer whom she knew from work. Appellant never threatened Jen or her roommate with the knife. He kept it at his side and never held it at her or toward her. The police arrived and took Appellant to Green Oaks Hospital; he was subsequently transferred to the VA Hospital. As far as Jen knew, the only alcohol or drugs that he had consumed on Friday or Saturday was one shot of vodka on Friday night.

Jen visited Appellant while he was at the VA Hospital. He was apologetic but did not seem to have any recollection of what had happened. VA medical personnel released Appellant from the VA Hospital on January 25. Later, Jen tried to visit Appellant at his house, but he was not at home. Instead, Appellant was at a friend's house smoking marihuana. Jen stayed with him that weekend, and he seemed "better" during the day. In the evenings, "it would seem like the medication was fading and he would get depressed, and sad, and tearful again."

The following week, Jen received a call from Jodi; she was upset because Appellant had been smoking marihuana. Jen phoned Appellant, and he made statements to her about gouging his own eyes out. Jen and her father went to check

16

on him, and he was sitting on the couch with a Bible on the floor next to him. He talked some with her and some with her father, but for the most part, he was staring at the wall.

On Friday, February 1, Jen again stayed with Appellant. When she first arrived at his house, he was on the back patio with some friends and was smoking marihuana. Appellant's marihuana use had become an issue between them. After Appellant's friends left, she tried to talk to him about the issue, but he became upset and started staring at a corner in the room. He was not acknowledging her presence, and she asked him if he was seeing things. He said, "[Y]es." She then asked him if he was hearing things, and he also answered, "[Y]es." He would not tell her what he was seeing or hearing because he thought that the "government" was listening. Instead, he used a yellow legal pad to write things down for her. He would not let her talk either. He wrote notes to her about making "pot cupcakes to make lots of money."

The next morning, Jen helped Appellant take a shower. She explained that he sometimes went weeks without a shower. Jen further testified that, around that same time, Watson called and said that he was going to come to Appellant's house. She told Watson that she and Appellant were fighting and that she was going to leave when Watson arrived. She left about twenty minutes after Watson arrived. She did not see Appellant smoke marihuana or drink any alcohol that morning.

Jen said that the marihuana relaxed him and made him calmer. Appellant never got aggressive, out of control, or violent when he smoked. However, Jen also gave examples of times when Appellant was "pretty quick tempered," such as when he dropped his beer and then threw his shoe halfway across the house and when he had road rage after someone tailgated him.

Watson testified that Jen called him to come to Appellant's house on the morning of the incident to help calm Appellant; Appellant and Jen were having an

17

argument. He believed that Jen had already left when he arrived. Appellant seemed to be in fairly good spirits. Watson further testified that Appellant was not violent when he smoked marihuana; they would just sit around and enjoy it. Appellant was normally relaxed and happy after he smoked. Watson estimated that the high would usually last for two or three hours. Watson had seen Appellant get upset and angry when he was drunk, but Watson testified that Appellant was not drunk on that particular day.

Watson and Appellant talked for a while and, at some point, smoked marihuana together. Watson testified that the marihuana that they smoked was not wet and that he had never smoked wet marihuana. He did not remember drinking any whiskey. During their conversation, Appellant became upset about his relationship with Jen. Appellant was also upset about his work situation. Watson gave him some advice and played a hymn for Appellant, and they talked about the Bible. Watson testified that Appellant believed in God and knew right from wrong.

At some point, someone came to Appellant's house, and Appellant went to meet that person. Watson did not see who came to the house, but he believed that it was Kyle. Appellant had mentioned to him that he was going to a gun range later that day with Kyle. Appellant abruptly left with that person, without telling Watson that he was leaving. Watson locked the house and went home. Kyle, Littlefield, and Appellant began their trip to the gun range near Glen Rose.

At trial, in support of his insanity defense, Appellant called Dr. Mitchell Dunn, a board certified psychiatrist, to testify as a mental health expert. The State presented the testimony of two mental health experts: Dr. Randall Price and Dr. Michael Arambula.

Each expert diagnosed Appellant differently, and each expert reached his diagnosis after personally evaluating Appellant and after reviewing evidence, witness statements, and medical records collected during the investigation. The

18

general diagnosis of each expert was as follows: Dr. Dunn believed that Appellant suffered from schizophrenia at the time of the offense; Dr. Price believed that Appellant suffered from a cannabis-induced psychosis; and Dr. Arambula believed that Appellant was intoxicated and, therefore, not able to claim that he was insane at the time of the offense.

We will first discuss Dr. Dunn's testimony and opinion. Dr. Dunn testified that he interviewed Appellant at defense counsel's request. He explained to the jury that, in terms of an insanity defense, "we think of a severe mental disease or defect as being one in which there is elements of psychosis . . . meaning some type of break in reality testing, not knowing what is factually occurring and what is true and what is not."

When he reviewed Appellant's hospital records from Green Oaks and the VA Hospital, Dr. Dunn learned that Appellant was initially hospitalized for a mental illness in July 2011. Appellant was diagnosed with a psychotic disorder; however, the psychosis was not pinned to a specific cause. He was also diagnosed with post-traumatic stress disorder. Appellant was prescribed antipsychotic medication, mood-stabilizing medication, and medication for anxiety. Five days after his initial discharge, Appellant was readmitted to the VA Hospital because he believed that he had a tapeworm that was causing him significant weight loss; he thought he was wasting away. Dr. Dunn explained that this type of thought was classified as a "delusion," meaning that it was "a false fixed belief," and she explained that a delusion was a type of psychosis. Appellant was again diagnosed with an unspecified psychotic disorder and with post-traumatic stress disorder. He was also diagnosed with cannabis abuse.

Appellant was next hospitalized in September 2012, after an incident in which he threatened to kill himself and his family. He was first taken to Green Oaks, and then he was transferred to the VA Hospital. At the VA Hospital, Appellant was

19

diagnosed with a major depressive disorder with psychotic features, post-traumatic stress disorder, alcohol dependence, and cannabis abuse. Appellant was again hospitalized in January 2013, after the incident at Jen's apartment with the Ninja sword. He was diagnosed as being paranoid due to his belief that someone was trying to hurt his girlfriend and as being paranoid about the government. He was further diagnosed with an unspecified mood disorder. Appellant was also again diagnosed with an unspecified psychotic disorder, post-traumatic stress disorder, and a major depressive disorder. He was again prescribed antipsychotic medication, mood-stabilizing medication, and anti-anxiety medication.

Through his evaluation and assessment of Appellant, Dr. Dunn formed the opinion that Appellant was having significant symptoms of psychosis on the day of the offense, as well as in the several days leading up to the offense. Leading up to the offense, Appellant was "having a lot of unusual thinking" or delusions that people were going to try to harm his girlfriend and him. He was also having paranoia about his neighbor, Detective Chevera. Appellant believed that Detective Chevera was with the Mexican Mafia and that he was a drug dealer. The day before the offense, Appellant knocked on Detective Chevera's door, and his wife answered. Appellant told Dr. Dunn that there was some kind of strange aroma that was coming from the home and that it was not the smell that you got from cooking a steak. Appellant began to think that they might be "blood-thirsty savages" or cannibals who might eat human meat. Because their sewer systems were connected, he also thought that, when he went to the restroom, his excrement would travel to his neighbor's home and his neighbor would eat it.

Appellant also believed that two people with Hispanic names who worked at the cabinet shop with him were cannibals, possibly a half pig and half man or "pig hybrid." He believed that the food that they ate looked different than food that people would normally eat and thought that it might be flesh of some sort. Appellant

20

became concerned that they might try to harm him and eat him. The workshop area had heaters, and Appellant "felt that maybe that it was a rotisserie and he was supposed to be cooked, because he was turning his body the way you would if you were on a spit in a rotisserie." Appellant was afraid to have his back to them, so he sat sideways at his workbench in order to keep an eye on them. Appellant further believed that pigs were taking over the earth.

Dr. Dunn explained that Appellant's boss or coworkers may not have noticed any difference in Appellant because, unless he actually told them his thoughts, he would look normal.

Appellant also told Dr. Dunn that, when Jen came to his house on the Friday night before the offense, her ears looked funny, and he thought that she might be a "pig hybrid" of some sort. He began to think that many people around him were pig hybrids. Appellant thought it was odd that the next morning Jen ate a piece of bacon because "why would you eat your own flesh -- or flesh of -- of your people." Appellant further told Dr. Dunn that, when he and Jen took a shower that next morning, he "wasn't expecting a tail or nothing" but that her ears did look unusual because they were "kind of pointing out." Dr. Dunn testified that he learned that Appellant would sometimes go many days without showering, which was consistent with a diagnosis of a mental illness. Dr. Dunn also noted that, on the night of the offense, Appellant made delusional statements to the officers at his house and to Ranger Briley during his interview.

Dr. Dunn also learned from Appellant that Appellant and his uncle drank whiskey and smoked marihuana on the morning of the offense. Appellant said that, when Kyle arrived at Appellant's house, Appellant was on the back porch smoking cigarettes. Appellant found it odd that Kyle did not introduce himself or shake his hand when he arrived. Appellant told Dr. Dunn that he left with Kyle and Littlefield and that they went to Whataburger. Appellant thought that was strange because he

did not want anything to eat, but Kyle was making him eat anyway. There was a big pile of guns next to him in the pickup, and he was feeling "pretty nervous." Appellant said it felt weird to go "do firearms" with a group that he had not met before.

Appellant told Dr. Dunn that he smelled the same odor in Kyle's pickup as he had smelled at Detective Chevera's house. The smell made his hair stand up on the back of his neck; it made him pretty anxious. Appellant thought that Kyle and Littlefield might be pigs. The three barely spoke on the drive from Lancaster to Rough Creek Lodge, and Appellant began to think that it was a "one-way trip." He thought that it was strange that they were not telling him where they were going or what was going on. When they passed through the front gate of Rough Creek Lodge, he felt paranoid because he saw two white cars that began to follow them. He began to think that Kyle and Littlefield were some type of "pig assassins, hybrid pigs, sent here to kill people." He also thought it was odd that Littlefield was not saying anything to him when Kyle went inside the lodge while he and Littlefield remained in the pickup.

Appellant explained to Dr. Dunn that, once they arrived at the gun range, Kyle and Littlefield began to unload the guns from Kyle's pickup. Appellant asked whether he could help, but Kyle and Littlefield did not respond. After the guns were unloaded, Appellant "slow fired" a nine-millimeter at a target that was about twenty to twenty-five meters away, and Kyle, who was on Appellant's right-hand side, shot at a target that was about thirty to forty meters away. Littlefield was not shooting at all, and Appellant found that to be "totally odd" because he was "pretty sure" that Littlefield had a pistol on him. He could not make any sense of it and felt like he was in danger. He thought that something was going to happen, so he fired at Littlefield and hit him in "center mass." He felt threatened and thought that he would "neutralize the threat." Appellant then saw Kyle turning, so he shot Kyle two to

three times in the back and the upper torso. Littlefield began "twitching around," and Appellant shot him in the head.

Appellant could not explain to Dr. Dunn why Kyle and Littlefield would have given him a gun if they planned to shoot him. When asked why they had not already shot him, Appellant told Dr. Dunn that he thought they might be biding their time because there was a better time and place to shoot him. In response to Dr. Dunn's question to him about why someone would come take Appellant to go shooting if they had planned to kill him, Appellant said that maybe they had not "got their fix in a while, like assassins need to kill people every so often."

Appellant further told Dr. Dunn that he stood over the bodies for about a minute and that he felt relieved. He did what he had to do to get out of the situation. When Dr. Dunn asked him if he thought he made a mistake, Appellant responded that the Bible says not to kill anybody but that it was necessary because he had to get out of the situation. He thought that killing someone was a "pretty sh--ty" thing to do and that some people would have done the same thing that he did but that others would not have done the same.

Dr. Dunn said that Appellant believed that he was going to be arrested but that Appellant thought that he had to kill Kyle and Littlefield or they were going to kill him. On cross-examination, Dr. Dunn agreed that Appellant knew that what he was doing would be viewed as illegal and that there was no question in his mind that the police were going to come after him and that he was going to have to explain to them why he had to do it. However, Dr. Dunn further testified that, in Appellant's mind, Appellant was acting in self-defense.

Appellant reported to Dr. Dunn that he took Kyle's pickup because the keys were in it. From the scene of the shooting, Appellant went to Watson's house in Alvarado; to his sister's house in Midlothian; to Red Oak to see his cousin, but his cousin was not home; to Taco Bell to get burritos because he thought that he would

23

be arrested and wanted to go ahead and eat; to his house in Lancaster to get his dog; to his friend's house so that he could figure out what to do, but his friend was not home; and back to his house where he encountered the police. He said that the police and his mother, who at one point was on the phone with him, tried to talk him into getting out of Kyle's pickup but that he did not. He admitted that leaving his house at a high rate of speed was dumb. Appellant said that he should have called the police from the shooting range.

Based on his assessment of Appellant and his review of the documents and videos that he was provided, Dr. Dunn formed the opinion that, at the time of the offense, Appellant was suffering from a severe mental disease or defect that prevented him from knowing that his conduct was wrong. Dr. Dunn specifically opined that Appellant was suffering from schizophrenia. He based his diagnosis on the fact that Appellant was exhibiting symptoms of schizophrenia, such as delusional beliefs, disorganized thinking, and restricted affect or restricted emotional response. He believed that the schizophrenia probably started in July 2011, at the onset of Appellant's delusional thinking. He noted that Appellant had been on antipsychotic medication the entire time he was in jail and that it was still being prescribed for him at the time of trial.

Dr. Dunn also testified that the medication that was prescribed to Appellant when he was treated at the VA Hospital indicated that hospital personnel believed that Appellant had psychotic symptoms and a psychotic illness that was "likely not one that was simply going to go away when he was no longer intoxicated." He explained that "[a]n intoxication-induced psychosis is one in which an individual has psychotic symptoms secondary to being intoxicated on some substance." Dr. Dunn further explained that, when a person is in the acute phase of intoxication, the person may become paranoid or experience hallucinations or delusions. If the person continues to exhibit psychotic symptoms after the person is no longer

intoxicated, the psychosis would not be considered a drug-induced psychosis. Dr. Dunn testified that a "normal high" on marihuana lasted two or maybe three hours. Dr. Dunn's opinion was that Appellant's psychosis at the time of the offense was not substance induced. He explained that Appellant's physical capabilities, coupled with his thought disorganization, were not what marihuana intoxication looked like. In addition, Appellant continued to be concerned with pig hybrids and continued to believe well after the offense that Kyle and Littlefield would have killed him, which was not indicative of drug-induced psychosis.

Defense counsel asked Dr. Dunn whether it was typical that Appellant could recall the details of his trip to Rough Creek Lodge. Dr. Dunn explained that there was nothing about suffering from schizophrenia that kept someone from remembering things. He opined that Appellant would have had difficulty remembering the details if he was highly intoxicated.

Dr. Dunn agreed on cross-examination that marihuana could make people acutely paranoid. However, the fact that Appellant smoked marihuana on the day of the offense or that he watched a show while he was in jail called "Boss Hog" that was about hunting feral hogs did not change Dr. Dunn's opinion that Appellant was suffering from schizophrenia at the time of the offense. He noted that Appellant made comments about "pigs" to Ranger Briley on the night of the offense, before he had seen the show, "Boss Hog," at the jail. Dr. Dunn further testified that he believed that people who were not mentally ill would have acted much stranger than Appellant acted in that they would have been much more disturbed and not nearly as disorganized as Appellant was. Appellant was not terribly emotional about the ordeal. If he was really trying to get away, the first thing that he would have done was head north of the border, not stop by and tell someone that he had to kill people and then go by his home and by other places. In addition, Appellant told Ranger Briley that he felt safer at the police department in handcuffs than he had felt all day.

25

Dr. Dunn thought that was very telling of Appellant's assertion that he had felt in danger throughout the day—Appellant finally felt safe once he knew he was going to be locked up for a long time.

Dr. Dunn also agreed that it was possible that Appellant could have killed Kyle and Littlefield out of anger or jealousy, but he did not see any evidence of that.

In contrast, the State's experts testified that Appellant did not suffer from a mental disease or defect in the first place. Instead, his behavior was attributable to ingesting drugs and alcohol. Dr. Price, a forensic psychologist, specifically testified that, in his opinion, Appellant was not insane at the time of the offense because, although Appellant was suffering from a mental disease or disorder at the time of the offense, the disorder that Appellant was experiencing was a result of his drug and alcohol use. Dr. Price also opined further that Appellant was not insane under Texas law for the additional reason that he knew that his conduct was wrong and was against the law.

Dr. Price testified that Appellant's references to "pig men" raised red flags because, through his evaluation of Appellant, he learned that Appellant had watched some television shows that had referenced pigs. Specifically, Dr. Price discovered that Appellant watched "Boss Hog," a show that was about pig hunting and trapping. The main character in the show was known as "Pig Man." Dr. Price also learned that Appellant watched the show, "Seinfeld." He explained that, in one of the Seinfeld episodes, Kramer (a character on the show) believed that he saw a "pig man, that was half human and half pig, and that this was the result of the United States Government research into the DNA . . . that they were creating [this] half man-half pig." However, Dr. Price did not know whether Appellant had seen that particular episode.

Dr. Price's diagnosis was comprised of five components: (1) that Appellant had a long-standing personality disorder; (2) that, at the time of the offense,

Appellant had an adjustment disorder that included problems with adjusting his emotions and conduct; (3) that Appellant had a substance-induced psychotic disorder due to cannabis at the time of the offense; (4) that Appellant had a cannabis use disorder; and (5) that Appellant had an alcohol use disorder.

Dr. Price specifically opined that Appellant had a paranoid personality disorder and a narcissistic personality disorder. He explained that a personality disorder was not a mental disorder: a personality disorder is just the way the person is, whereas a mental disease or defect is a disease that causes the person to deteriorate and reduces the person's ability to function. He further explained that a personality disorder was usually stable over adulthood in that the person would have it for a long time. However, with regard to a mental illness such as schizophrenia, he explained that "there comes a time when the person has a first break, and . . . before that people would say that the person didn't look like they were mentally ill at all." He stated that a personality disorder would not be classified as a severe mental illness under the insanity statute. Dr. Price also explained that when someone with a paranoid personality disorder becomes intoxicated, especially with marihuana, their suspiciousness becomes heightened.

As to Appellant's narcissistic personality disorder, Dr. Price explained that Appellant felt that he was special and deserved a special kind of treatment. If he was not treated a certain way, he became agitated. Dr. Price believed that the paranoid personality disorder was more predominant than the narcissistic personality disorder.

Dr. Price further opined that Appellant began having adjustment problems toward the end of his service in the Marines when Appellant was not getting to do what he wanted to do and that he continued to have difficulty adjusting to life outside the Marines. In addition, Dr. Price classified Appellant as a heavy user of marihuana and explained that the heavy use caused problems in Appellant's life, such as

27

suffering from amotivational syndrome, where someone does not want to do anything, and from asocial symptoms, where someone tends to isolate him or herself. Dr. Price believed that the heavy use predisposed Appellant to experiencing psychotic symptoms. He also explained that marihuana use at any level could lead to feelings of paranoia, visual distortions (such as people looking different than they have in the past), and distortions of time.

Dr. Price believed that Appellant was under the influence of marihuana at the time that he committed the offense and, more specifically, that Appellant was suffering from a cannabis-induced psychotic disorder at the time of the offense. Although Dr. Price agreed that cannabis intoxication typically lasted for about three to four hours, he testified that cannabis-induced psychotic symptoms could last for days after the period of intoxication had passed. Such symptoms included a disruptive thought process, disconnected thoughts, saying odd things, having visual or olfactory hallucinations, becoming irritable, and experiencing some depression. Dr. Price testified that cannabis-induced psychosis was rare but that using cannabis early in life, using it heavily, and using it in conjunction with alcohol would increase a person's chances of experiencing cannabis-induced psychotic symptoms. The chances would also increase if the person had an underlying condition such as schizophrenia or paranoid personality disorder. On cross-examination, he testified that this was only his second diagnosis of cannabis-induced psychosis in thirty years.

Dr. Price did not believe that Appellant had schizophrenia at the time of trial or at the time of the offense. He testified that Appellant did not have auditory hallucinations, which were most common with schizophrenia, but instead had visual and olfactory hallucinations, which were common with cannabis-induced psychotic symptoms. He believed that Appellant's use of idiosyncratic symbolism and metaphors were Appellant's way of getting people's attention; it would shock them into paying attention to him. Appellant's reference to people "trying to suck the soul

out" of him was, in Dr. Price's opinion, a way for Appellant to communicate that people were trying to take advantage of him and trying to get something from him, which was consistent with thoughts of someone who suffered from paranoid personality disorder.

On cross-examination, Dr. Price acknowledged that there was no evidence of psychosis during Appellant's teen years, even though Appellant reported using marihuana during his teen years. He also acknowledged that Appellant's first psychotic episode was in July 2011 and that he was prescribed antipsychotic medication during that hospitalization, as well as each subsequent hospitalization. Dr. Price did not agree that it was wrong for doctors to prescribe antipsychotic medicine even though he believed that Appellant's psychosis was drug induced.

Regarding whether Appellant was faking psychotic symptoms, Dr. Price testified that Appellant did not embellish or exaggerate psychiatric symptoms if he was being asked questions face-to-face but that he did exaggerate psychiatric problems when he was asked true or false questions on a written form. Dr. Price also explained that he believed that Appellant was "setting the stage for . . . it wasn't my fault" when he made comments to police about whether he was insane or schizophrenic. Dr. Price testified that people with schizophrenia do not have that much insight into what is going on and that Appellant had a history of telling the police, when he was being arrested, that he was an ex-Marine and had post-traumatic stress disorder.

When he tested Appellant, Dr. Dunn used the "Miller Forensic Assessment of Symptoms Test" to test whether Appellant was faking psychotic symptoms. Appellant's score did not indicate that he was faking symptoms of psychosis or mental illness. Dr. Dunn testified that the strongest piece of evidence that showed that Appellant was not faking his mental illness was the text message between Kyle and Littlefield in which Kyle texted Littlefield, "[T]his dude is straight up nuts." He

29

explained that the text message was an important factor because Kyle and Littlefield were the people that saw Appellant and saw how he was acting nearest to the time of the offense. He further explained that Kyle was used to seeing people who were a little bit strange, who had post-traumatic stress disorder, or who were disturbed by the war, and the fact that he sent that text message to Littlefield and Littlefield responded, "[W]atch my 6," was "pretty strong support" that Appellant was suffering from a mental disease on the day of the offense.

Concerning the offense itself, Appellant told Dr. Price that, on the morning of the offense, he was trying to break up with his girlfriend because she was "always b----ing at him about dipping Copenhagen and smoking marijuana." He told her to take her stuff and leave, and he called his uncle to come over. He and his uncle drank some coffee and whiskey, but Appellant said that, although they wanted to smoke marihuana, they could not find any. He also told Dr. Price that, on that morning, he was very agitated about living with his mother, about the VA Hospital, and about his girlfriend and that he could not "get the edge off." When Kyle came to get him, Appellant was surprised and was also surprised that Kyle brought Littlefield with him. Dr. Price did not understand whether Appellant was surprised that Kyle came at all or just that he was surprised that he came around 1:00 p.m. Appellant was also surprised to learn that they were going to a shooting range.

Appellant was also surprised and suspicious of the presence of all the guns and ammo that were in the backseat of Kyle's pickup, and he thought that it was against the law to have guns that close to ammunition. Appellant indicated that several things on the drive to Rough Creek Lodge agitated him. He was agitated when Kyle and Littlefield stopped and bought him Whataburger even though he was not hungry, he was agitated that Kyle was driving "really fast" because he thought it was dangerous, and he was agitated that neither Kyle nor Littlefield were talking to him. He was also agitated because Kyle did not shake his hand when Kyle came

30

to his house. Appellant did not believe that they were treating him right, and he began to fear for his life when he realized that they were going to a shooting range "out in the boonies." He felt as though he needed to get out of that situation. He told Dr. Price the same story that he told Dr. Dunn: he became suspicious of Littlefield standing off to the side and not shooting, so he shot Littlefield before Littlefield could shoot him. He also told Dr. Price that he did not plan it methodically but that, in some kind of tactical scheme, he shot the target facing him (Littlefield) first and shot the target facing away from him (Kyle) second. As soon as he shot them, he "thought, Jesus Christ, what have I done," and he "became immediately remorseful."

Dr. Price explained that he believed that Appellant knew that what he did was wrong because Appellant chose the time that he was going to kill them. He said that Appellant considered killing them on the way to the gun range but resisted because Appellant thought that they might have an accident if he shot them while they were driving. Instead, Appellant waited until Kyle had just "emptied" the gun that he was shooting and had his back turned to Appellant before Appellant shot them. Appellant's comment that he felt "instantly remorseful" also indicated that he knew what he did was wrong, as did the fact that Appellant fled the scene. Dr. Price further believed that Appellant knew what he did was wrong because Appellant knew that he was going to be arrested and admitted to Ranger Briley and Dr. Dunn that he knew that what he did was wrong.

Dr. Arambula, a licensed medical doctor who was board certified in psychiatry and forensic psychiatry, also opined that Appellant was not insane at the time of the offense. Dr. Arambula explained that, because Appellant was intoxicated at the time of the offense, Appellant could not have been legally insane at the time of the offense. Furthermore, Dr. Arambula did not believe that Appellant had a severe mental disease or defect at the time of the offense, nor did he believe that

Appellant did not know that his conduct was wrong. He explained that, each time that Appellant was hospitalized, the medical professionals were unable to specifically diagnosis him. Dr. Arambula testified that the symptom cluster that the doctors observed was likely not due to a pure mental illness and, thus, that there was something "muddying the water" that persisted throughout the timeframe of Appellant's hospitalizations. He, too, believed that drug and alcohol use was the cause of Appellant's psychotic symptoms. Therefore, he did not believe that Appellant suffered from schizophrenia.

Dr. Arambula testified that PCP made people do wild things and that he had seen several cases where he could tell because of their behavior, without doing a blood test, that people were probably on PCP. He testified that, over the long term, formaldehyde was known to have an adverse effect on how the brain worked but that it was not associated with violence as much as PCP was. Individuals on formaldehyde tended to be more confused, did not make sense, and could not think clearly, but they still could become agitated.

However, the record reveals that Appellant told Dr. Dunn that he did not believe that he had ever used PCP or formaldehyde. Dr. Dunn acknowledged, however, that there was a notation in Appellant's July 2011 hospitalization records that Appellant had reported using marihuana with embalming fluid (formaldehyde) and that Appellant told Ranger Briley that his marihuana could have been laced with anything, including PCP or formaldehyde. Dr. Dunn explained that, while it was possible for formaldehyde to be in marihuana and the buyer just not know, the patients who had admitted using formaldehyde to him reported that they dipped it themselves. In addition, Dr. Dunn testified that he did not see any evidence that Appellant actually used "laced-up" marihuana on the day of the offense.

Dr. Arambula further explained that, generally, marihuana was a low potency drug but that, if a person was a heavy user, the person could start hallucinating and

32

become psychotic because marihuana was in the hallucinogen class, like LSD and PCP. He further explained that marihuana was largely a calming drug but that there was a period just before the euphoria where the user would often feel anxious, afraid, suspicious, or paranoid. If the user was agitated before he smoked, the period of anxiety and suspiciousness would intensify the agitation. Alcohol use in combination with marihuana use could also cause the state of anxiety to increase. Dr. Arambula testified that, based on the evidence that he reviewed, Appellant was a heavy user of marihuana.

Appellant told Dr. Arambula that he was very suspicious during the time leading up to the offense, but Appellant could not describe in detail why he was suspicious. Dr. Arambula testified that the lack of detail or content indicated that Appellant was not at a level of paranoia that would make him psychotic or delusional to support a diagnosis of schizophrenia. Instead, Dr. Arambula concluded that Appellant suffered from a mood disorder. He explained that, although Appellant was prescribed antipsychotic medication, the doses that he was prescribed were very low. Antipsychotic medication was not only used to treat patients that were psychotic but was also used, in lower doses, to treat patients who suffered from bipolar disorder, a mood disorder, a thought disorder, or even depression.

Dr. Dunn, however, disagreed. He noted that Appellant was prescribed the antipsychotic medication and a separate mood-stabilizing medication. He explained that there would be no need to give Appellant both medications if he was only suffering from a mood disorder. Dr. Dunn also did not agree that the lower dose of the antipsychotic medication indicated that it was being used to treat a mood disorder because, in his opinion, many doctors would start at a lower dose to see if the patient would respond to a lower dose before exposing the patient to a higher dose and a higher risk of side effects.

Dr. Arambula, like Dr. Price, opined that Appellant was trying to look out for

himself and to avoid being severely punished when he asked whether he was going to the insane asylum and when he made comments that he was insane, that maybe he had schizophrenia, and that he was paranoid. Dr. Arambula explained that a person who actually has a severe mental illness is usually reluctant to admit that he has a serious problem because he would have great difficulty accepting that he has a mental illness.

Appellant told Dr. Arambula that he did know that he was going to a shooting range with Kyle that day. Dr. Arambula testified that, when Appellant told him that, it was almost as if Appellant had caught himself in a contradiction because Appellant then told him that he had never told anyone else that he knew he was going to a shooting range but that he just wanted to let Dr. Arambula know. Appellant maintained that he did not know that Littlefield was going with them and that he was aggravated that Kyle brought Littlefield. He was further aggravated that Littlefield did not talk to him or shake his hand. Appellant told Dr. Arambula that he was not bothered by the guns in the pickup but that he began to smell a sweet, musty odor on the way to the range. Appellant also told Dr. Arambula that, once they arrived at the range, he walked around the railing and down the range to get closer to the targets. Dr. Arambula found this behavior to be inconsistent with someone who was suspicious or paranoid that someone else was going to kill him because walking in front of the railing placed Appellant in front of the guns with his back to the guns while he was shooting at the target. Dr. Arambula explained that someone who was paranoid about being killed was not going to turn his back to someone that had access to multiple guns; "that's just not going to happen." Appellant also told him that he walked back around the railing to reload his gun. He was very bothered that Littlefield was not shooting, so he shot him; Littlefield did not make any moves. Appellant said that he had to shoot Kyle because Kyle would have shot him but that, otherwise, he did not have an issue with Kyle. Dr. Arambula testified that

34

Appellant's thought process was not psychotic thinking; it made sense even though it was terrible.

In addition, Dr. Arambula believed that Appellant knew his conduct was wrong. Dr. Arambula reached this conclusion based on the evidence that Appellant immediately thought that he had done something terrible, that he fled the scene and intended to flee to Oklahoma, that he went to get food for his last meal because he knew that he was going to be arrested, that he was in a standoff with police, that he fled from the police at his house, that he put his hands up and got down on the ground when he finally exited the pickup, and that he admitted that he knew that what he did was wrong.

Dr. Arambula explained that, depending on how severe a mood disorder was, a mood disorder could be a severe mental disease or defect. However, Dr. Arambula did not believe that Appellant's mood disorder rose to the level of a severe mental disease or defect due to Appellant's lack of delusions and his intoxication. He believed that Appellant's thoughts were "suspicions," not delusional or psychotic beliefs. In rebuttal, Dr. Dunn disagreed with Dr. Arambula's testimony in which Dr. Arambula opined that Appellant could not claim that he was insane at the time of the offense if he was intoxicated. Although Dr. Dunn did not believe that Appellant was intoxicated at the time of the offense, he explained that Appellant still could have been legally insane at the time of the offense even if he was also intoxicated. Dr. Dunn further explained that, if the psychosis was caused by the intoxication, Appellant could not claim that he was insane. However, if the psychosis was caused by a mental disease or defect, such as schizophrenia, Appellant could be found to be insane.

Despite their differences in opinion, Dr. Dunn, Dr. Price, and Dr. Arambula all agreed on one thing: there was no evidence to show that Appellant had suffered

the type of significant trauma that would support a diagnosis of post-traumatic stress disorder. Therefore, none of them diagnosed Appellant with PTSD.

In our legal sufficiency review, our first step is to determine whether there is more than a scintilla of evidence to support the jury's rejection of Appellant's affirmative defense. *Matlock*, 392 S.W.3d at 669. We conclude that there is more than a scintilla of evidence to support the jury's rejection of Appellant's insanity defense. The State presented evidence that Appellant used marihuana and alcohol on the day of the offense, and Dr. Price and Dr. Arambula both testified as to their opinions about Appellant's drug and alcohol use. In addition to their opinion that Appellant did not suffer from a mental disease or defect at the time of the murders, Dr. Price and Dr. Arambula also both opined that Appellant knew that his conduct was wrong based on the way that he killed Kyle and Littlefield, the fact that he fled, and the fact that he admitted what he did was wrong. Because we have found some evidence to support the jury's adverse finding, we need not look to whether Appellant conclusively established his affirmative defense as a matter of law, and we must reject Appellant's challenge to the legal sufficiency of the evidence to support the jury's adverse finding. *See id.* at 669–70.

To determine whether the evidence was factually insufficient, we look at the entirety of the evidence in a neutral light to determine whether the jury's adverse finding was so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* at 671. We have outlined in great detail the testimony of the three experts as to their findings, and the bases of those findings, regarding the issue of Appellant's sanity. Each of the three experts came to a different conclusion as to what caused Appellant's actions before, during, and after the offense, and we cannot substitute our judgment in place of the jury's assessment of the credibility of each of their findings. There was ample evidence presented in this case by both Appellant

and the State to aid the jury's decision on whether Appellant suffered from a mental disease or defect.

Dr. Dunn opined that Appellant was suffering from schizophrenia at the time of the offense, and in response, Dr. Price opined that Appellant was suffering from paranoid personality disorder and from a drug-induced psychosis at the time of the offense. Dr. Arambula also disagreed with Dr. Dunn's assessment, and he opined that Appellant was suffering from a mood disorder and that Appellant was intoxicated at the time of the offense. Although the State did not conclusively prove through a chemical analysis of Appellant's blood that Appellant was intoxicated at the time of the offense, Dr. Price testified that cannabis-induced psychosis could last well after the intoxicating effects had passed. Dr. Price also testified that he believed that Appellant exaggerated his psychosis at times, and Dr. Arambula opined that Appellant's thoughts did not rise to the level of delusions or psychosis that would be expected for someone who was suffering from a mental disease or defect. Both Dr. Price and Dr. Arambula believed that Appellant was setting himself up for an insanity defense. Dr. Dunn believed that Appellant was truly insane.

In addition, to rebut Dr. Dunn's opinion that Appellant believed he was acting in self-defense, the State presented evidence that Appellant waited until Kyle had finished shooting before he chose to attack Kyle and Littlefield. The State also presented evidence that Appellant shot Kyle and Littlefield multiple times and continued to shoot Littlefield in the head after he was already on the ground. Furthermore, the State presented evidence that Appellant fled from the crime scene, fled from the police at his home, and admitted that he knew what he did was wrong. "If the accused knows that his conduct is 'illegal' by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified." *Pham v. State*, 463 S.W.3d 660, 671 (Tex. App.—Amarillo 2015, pet. ref'd) (citing *Ruffin*, 270 S.W.3d at 592).

37

As we have stated, we may not substitute our judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony even in our review of the evidence in a neutral light. *Matlock*, 392 S.W.3d at 671. Here, Appellant and the State presented thorough, detailed, and competing evidence on the issue of insanity. The three experts evaluated Appellant; reviewed multiple witnesses' statements, police reports, medical records, and photographs; and reached separate conclusions, each of which explained Appellant's behavior to the jury. Therefore, we cannot say, based on the record before us, that the jury's rejection of Appellant's insanity defense was so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellant's first point of error is overruled.

In his second point of error, Appellant claims that the trial court erred when it denied his motion to suppress the statement that he made to Ranger Briley. Appellant asserts that the statement was taken in violation of Article 38.22 of the Texas Code of Criminal Procedure and of the Fifth and Fourteenth Amendments to the United States Constitution. Appellant specifically contends that he did not understand his warnings under Article 38.22 and, therefore, did not voluntarily give his statement to Ranger Briley. He alleges that he was in a psychotic state at the time of the interview and that he would not have given a statement if he had understood that he could terminate the interview.

Appellant alleged in his motion to suppress that the "statements were taken as a result of improper promises and inducements made to the Defendant by law enforcement agents" and that, therefore, the statements were not voluntarily given. During the hearing on the motion to suppress, defense counsel represented Appellant's argument to the trial court to be that Appellant did not understand his *Miranda*[1] warnings and did not understand that he had a right to an attorney.

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Specifically, defense counsel argued that Appellant's statements were not voluntary because of his state of mind; Appellant did not have, due to his mental illness, the ability to understand what was happening. Appellant renewed his objection to the admission of his statement during trial, and the trial court again denied his request to suppress his statement. At oral argument, Appellant's counsel argued that Appellant did not expressly waive his rights because he did not verbally acknowledge that he was waiving his rights; he simply nodded his head. Defense counsel did not present this specific argument to the trial court.

The State responds that Appellant's waiver of his right to remain silent and his right to counsel was voluntary and free from coercion. The State notes that Appellant did not present any evidence during the suppression hearing to show that he suffered from a severe mental disease or defect. The State further argues that, even if the trial court erred when it admitted the statements, the evidence of Appellant's guilt was so overwhelming, independent of the statements, that such error did not substantially affect the jury's finding of guilt.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give great deference to the trial court's findings of historical facts as long as the record supports the findings. *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997). Because the trial court is the exclusive factfinder, the appellate court reviews evidence adduced at the suppression hearing in the light most favorable to the trial court's ruling. *Carmouche*, 10 S.W.3d at 327. We also give deference to the trial court's rulings on mixed questions of law and fact when those rulings turn on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 87. Where such rulings do not turn on an evaluation of credibility and demeanor, we review the trial court's actions de novo. *Id.*

Here, the trial court specifically found that Appellant "understood the rights of which he had been advised" and "that no evidence was presented that [Appellant] failed to understand his rights or that he did not voluntarily waive those rights." The trial court further found that "no evidence, credible or otherwise, was presented that [Appellant] was unduly frightened, coerced, or otherwise improperly induced into providing his statement." We hold that the record supports the trial court's findings.

Ranger Briley testified that he believed that Appellant understood his rights, specifically his right to remain silent and his right to counsel. He explained that he advised Appellant of his *Miranda* rights and asked him if he understood those rights. Appellant "nodded his head yes, in an up and down fashion." Ranger Briley attempted to have Appellant verbally state that he understood his rights, but Appellant "was sort of in a nonresponsive . . . form at that time" and just "continued speaking" to Ranger Briley about what happened. He did not have Appellant sign or initial a written waiver of his *Miranda* warnings.

We have outlined Appellant's responses and comments in our review of the sufficiency of the evidence above, and we will not detail them again here. Ranger Briley testified that he believed that Appellant was competent enough to know what they were talking about during the interview. He explained that, although Appellant did not directly respond to all of his questions, Appellant was able to discuss the mechanics and the details of the offense. He thought that Appellant was "hallucinogenic sounding"; "possibly under influence of drug"; "philosophical, possibly poetic at times"; and "sometimes . . . nonresponsive." Defense counsel asked Ranger Briley whether he thought that specific answers by Appellant were delusional or rational. In one instance, Ranger Briley responded that Appellant was "possibly delusional." In another instance, he stated, "That's just what he states, I don't know . . . that it sounds rational at all." At other times, Ranger Briley did not directly answer whether he believed that Appellant was delusional and explained

40

that oftentimes people tried to avoid answering his questions. He believed that Appellant was stable enough to be interviewed but that Appellant was "possibly delusional or drug-induced sounding at times" and that perhaps some of his answers did not sound rational. Ranger Briley was not aware at the time of the interview that Appellant had a history of mental illness or that Appellant had recently been released from the VA Hospital.

At trial, Ranger Briley testified that he believed that Appellant understood his rights and knowingly and intelligently waived those rights. Appellant nodded his head "yes" when Ranger Briley asked him if he understood his rights. Further, Appellant did not stop the interview or ask for a lawyer. On cross-examination, Ranger Briley agreed that several responses made by Appellant did not make sense and that oftentimes Appellant would not answer the question that Ranger Briley asked him. Specifically, Ranger Briley agreed that Appellant's response to whether he understood his rights was nonsensical. When Ranger Briley asked Appellant if he understood his rights, Appellant stated, "I never knew that counsel was more -- you know, counseling between men and women needed to be more heavy in the world than it did, but when you're all surrounded by all fronts, when it begins you can't just start in one place." Ranger Briley then asked Appellant whether Appellant was okay with talking with him. Appellant responded, "I've been living with someone with their hand up my a-- my whole life, you know, I'm not okay, that's not right."

Article 38.21 of the Texas Code of Criminal Procedure provides that a defendant's statement may be used in evidence against him if he made it freely and voluntarily and without compulsion or persuasion. TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). Article 38.22 requires that a defendant knowingly, intelligently, and voluntarily waive his rights before a statement made while he was in custody may be used against him. *Id.* art. 38.22, § 3(a)(2). The determination of

41

whether a statement is voluntary is based on an examination of the totality of circumstances surrounding its acquisition. *Penry v. State*, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995) (citing *Griffin v. State*, 765 S.W.2d 422, 429 (Tex. Crim. App. 1989)). There is no requirement that a defendant explicitly waive his rights. *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). A waiver can be inferred from the actions and words of the defendant during the interview. *Id.*

Generally, "an accused's mentality is but one factor among many to consider when evaluating the voluntariness of a confession." *Delao v. State*, 235 S.W.3d 235, 240 (Tex. Crim. App. 2007). However, if the mental impairment is so great that an accused is incapable of understanding the meaning and effect of his confession, the confession is inadmissible. *Casias v. State*, 452 S.W.2d 483, 488 (Tex. Crim. App. 1970). When a defendant presents evidence raising a voluntariness question, the prosecution must controvert the evidence and prove voluntariness by a preponderance of the evidence. *State v. Terrazas*, 4 S.W.3d 720, 725 (Tex. Crim. App. 1999). However, the State is not subject to this burden until a defendant presents evidence that raises a voluntariness question. *Id.*

The totality of circumstances surrounding Ranger Briley's interview of Appellant supports the trial court's determination that Appellant understood his rights and made a free and deliberate choice to waive his rights. Appellant was lawfully arrested and transported to the police station after refusing to get out of Kyle's pickup and after fleeing from the police. The video recording of the interview shows that Ranger Briley advised Appellant of his rights, and Ranger Briley testified that Appellant nodded his head, "Yes," when Ranger Briley asked him if he understood his rights. Although Appellant did not explicitly state that he waived his rights, he talked with Ranger Briley without hesitation and never asked for an attorney or to terminate the interview. There is no question that some of Appellant's responses were nonsensical. However, as Ranger Briley testified, Appellant was

able to recall and explain specific details of the offense. Thus, Ranger Briley believed that Appellant was competent to talk to him about the offense.

Furthermore, although the issue of Appellant's mental state was thoroughly discussed throughout the trial in terms of whether he was insane at the time of the offense, there was no evidence regarding whether his mental state was of such a nature to render him unable to understand his rights at the time of the interview. In fact, at the suppression hearing, there was no direct evidence presented regarding Appellant's mental state. Defense counsel asked Ranger Briley if he agreed that some of Appellant's statements were delusional, but whether some of Appellant's statements were delusional does not answer the question of whether Appellant understood his rights. Although Appellant did not expressly state that he understood or waived his rights, Ranger Briley testified that Appellant nodded his head in affirmation and began talking with him. There was no testimony presented during the suppression hearing or the trial that suggested that Appellant was incompetent or unable to understand everything that people told him. Even Dr. Dunn testified at trial that, in his opinion, Appellant knew that the police were after him and that he would have to explain what he did and why. Dr. Dunn's testimony suggests that Appellant understood that the police would want to talk to him about Kyle and Littlefield. When asked whether he knew right from wrong, Appellant responded that he did. He also requested to give his mother one last hug, a fact that indicates that Appellant knew the severity of the situation.

We also note that there was no evidence that the police coerced Appellant into giving a statement or induced him with any type of promises or favorable treatment. Having reviewed the evidence in the light most favorable to the trial court's ruling, we cannot say that the trial court abused its discretion when it found that, based on the totality of the circumstances, Appellant understood his rights and voluntarily

waived his rights. Therefore, the trial court did not err when it denied Appellant's motion for new trial. Appellant's second point of error is overruled.

Appellant argues in his third point of error that the trial court abused its discretion when it overruled his motion for a mistrial based on the prosecutor's conduct of displaying a vial in front of the jury when that vial was not properly admitted into evidence. He asserts that the instruction given by the trial court did not cure the harm created. We disagree. In addition to the trial court's instruction to disregard, the prosecutor explained the mistake to the jury, the chemist responsible for the vial provided detailed testimony regarding the origin of the vial, and the court permitted the State to withdraw the vial from evidence.

The vial was shown to the jury during Ranger Armstrong's testimony regarding his search of Appellant's house. Ranger Armstrong testified that one of the items he found was a metal tin that contained drug paraphernalia. According to standard operating procedures, the chemist at the lab placed a glass vial of clear liquid within the tin, as well as within the box that contained the bong, during the testing process. The glass vial was not present when Ranger Armstrong seized evidence from Appellant's home. Despite this fact, the prosecutor asked Ranger Armstrong, while Ranger Armstrong was holding the vial in front of the jury, whether the glass vial was the type of vial into which a person could stick a syringe. Ranger Armstrong responded, "Yes, it is." Appellant did not object to the admission of the metal tin or to the prosecutor's question. However, once the prosecutor announced the error, Appellant moved for a mistrial.

Defense counsel argued that there was an inference that there were drugs in the vial, like methamphetamine or some other type of controlled substance. The trial court denied the mistrial and allowed the prosecutor to explain to the jury that the vials were not found at Appellant's house but were, instead, placed with the exhibits during testing. In addition, the trial court specifically instructed the jury to disregard

44

and not consider the glass vials for any purpose and to disregard any testimony that related to the vial being used in conjunction with a syringe or any inference that the vial from the metal tin was drug paraphernalia.

The prosecutor then called the chemist, who testified that she placed the vials back with the exhibits during the testing process. She explained that the vials contained "the remainder of the chloroform extract that was left over after [her] analysis" and that the purpose of preserving the vials was to provide the defense with analytical material to retest if it desired. In addition, she confirmed that marihuana was the only illegal substance found in the metal tin and that no illegal substances were found in the "bowl of the hookah pipe."

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). "A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). "Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial," and there is a general presumption that a jury will follow the judge's instructions. *Gamboa*, 296 S.W.3d at 580. "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins*, 135 S.W.3d at 77.

Here, there is no indication in the record that the jury disobeyed or refused to follow the trial court's instruction to disregard. Furthermore, the prosecutor made it very clear that the vial was not found at Appellant's house, and the chemist specifically testified that no other illegal substance besides marihuana was found. Thus, the potential inference that the vial contained methamphetamine or some other type of controlled substance was completely dispelled by the chemist's testimony. This is not a case in which the prejudice was incurable. The prosecutor and the

chemist explained the mistake to the jury; the vial was withdrawn from evidence; and the trial court instructed the jury to disregard any testimony regarding the vial being used in conjunction with a syringe. Accordingly, we cannot conclude that the trial court abused its discretion when it denied Appellant's request for a mistrial. Appellant's third point of error is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT
CHIEF JUSTICE


March 31, 2017

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.